IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

```
SAMANTHA WILKS,                    )
                                   )
          Plaintiff,               )
                                   )
v.                                 )   Case No. CIV-18-080-KEW
                                   )
BNSF RAILWAY COMPANY,              )
a corporation,                     )
                                   )
          Defendant.               )
```

**O R D E R**

This matter comes before the Court on the following Motions:

- Defendant's *Daubert* Motion Regarding David Anthony Rangel (Docket Entry #157);

- Defendant's Fourteenth Motion in Limine Regarding David Rangel's Opinions on the Cotter Key and Its Removal (Docket Entry #155); and

- Defendant's Fifteenth Motion in Limine [Regarding Whether] RFE Beals Intentionally or "Maliciously" "Tricked" Plaintiff into Violating Federal Law by "Hiding" Vital Information or That RFE Beals is Culpable for Plaintiff's Injuries (Docket Entry #156).

On August 10, 2020, this Court conducted a hearing to receive the testimony of Mr. Rangel. Counsel for the parties was present and inquired of the witness.

This case is brought under the Federal Employers' Liability

1

Act ("FELA") and the Federal Safety Appliance Act ("FSAA") after Plaintiff allegedly suffered an injury while assisting in the replacement of a broken knuckle on a locomotive operated by Defendant. Specifically, as a part of replacing the knuckle, it was necessary to remove a cotter key to allow the removal of the knuckle. The method and tools necessary for the safe removal of the cotter key stands as one of the disputed issues in this case. David Anthony Rangel was secured by Plaintiff as an expert witness on these issues. Defendant challenges both the qualifications of Mr. Rangel to render an opinion on the issues identified in his expert report and his methodology in reaching the conclusions contained in his opinions.

Mr. Rangel testified that he has never been employed by a railroad and that his experience in the railroad industry began in 1994 when he first owned the MODOC Railroad. Prior to this ownership, Mr. Rangel did voice over work in the movie and film industry for 15 years in California. He possesses no college degree. His expertise in entirely based upon his experience with this railroad and the MODOC Railroad Academy which he started at the suggestion of a "college buddy" who worked for BNSF to train others on railroad operations.

According to Mr. Rangel, the MODOC Railroad ceased operations in January of 2020. When it existed, this railroad consisted of the leasing of three miles of track. It had no mechanical

2

department. Mr. Rangel testified that he has not be trained as a certified machinist or carman or in locomotive maintenance. He received in class training from BNSF to be a conductor and is trained and certified as an engineer.

To arrive at his opinions, Mr. Rangel testified that he sent 12 e-mails to BNSF employees to ascertain whether they had received training in the removal of cotter keys on knuckles. According to his expert report, his e-mails posed two questions: (1) "[d]oes BNSF provide you training on removing safety cotter keys from coupler pins" and (2) "did you know that locomotives had safety cotter keys on the coupler pins?" He stated that he received nine responses. His expert report states that eight of the persons surveyed stated "no" to both questions and one that he designated as a "Rapid Responder" for the railroad stated "yes" to both questions.

Mr. Rangel testified that he does not remember the names of the employees and is not in possession of the nine responses that he allegedly received in response to his e-mail inquiries. He also stated that he "cannot access" the e-mails that he sent. He remembered that some of the parties he contacted were employed in the Illinois, Arizona, and Texas regions but he cannot remember where the rest worked. Mr. Rangel stated that he chose to contact the 12 BNSF employees that he chose to contact because they were all he could remember as people that he trained in his MODOC

Academy and later were employed by BNSF. To be clear, Mr. Rangel confirmed that BNSF never sent employees to him to be trained. He stated that he never requested names of BNSF employees who were trained in Tulsa and he did not know the positions that the 12 persons he contacted currently occupied. Mr. Rangel stated that he did not follow up with the e-mail respondents to determine their methodology in the removal of a cotter key.

Mr. Rangel also testified that he contacted CSX Railroad employees. His expert report, however, does not reference that his opinions were based upon any such contacts.

Mr. Rangel testified on re-direct examination that he never removed a cotter key from an F-style knuckle such as is at issue in this case. In fact, he confirmed that he did not know F-style knuckles had cotter keys until 2008 when he purchased a locomotive. As a result, prior to 2008, Mr. Rangel did not train in the removal of cotter keys from F-style knuckles at his MODOC Academy. In his deposition, Mr. Rangel testified that he did not know if the only way to remove a cotter key safely was with a blow torch or a key knocker device. He changed his mind in his testimony at the hearing and stated that he now believes that using a hammer and chisel for the removal of the cotter key is unsafe. He also testified that the first time he had used a key knocker device to remove a cotter key was eight months ago.

In his expert report, Mr. Rangel concluded, in pertinent part,

4

that:

- The accident allegedly resulting in injury to Plaintiff was preventable because "[t]here was absolutely no reason for either crew member to attempt to remove the safety cotter key on the broken coupler", Plaintiff and the conductor did not have a key knocker tool or blow torch to remove the cotter key, and "[n]either crew member had any advance training or warning from railroad officers that the crew's attempts to remove the safety cotter key (sic)."

- Plaintiff and the conductor were "tricked into unknowly (sic) violating federal law in CFR 49 § 240.305(a)(5)(6)" and he "demonstrated malicious personal and company intent to jeopardize the crew's safety and continued employment by hiding vital information from [Plaintiff] and the conductor"; namely, that they could not safely remove the cotter key from the knuckle pin with the tools they had on hand.

- BNSF's "Mechanical Help Desk" should have known that specialized tools were required to remove the cotter key and the crew of the locomotive did not have those tools.

- BNSF failed to provide adequate training on the safe removal of the cotter key (utilizing the e-mail responses from nine alleged BNSF employees).

- Information was kept from the Rapid Responder that the train was fixed by the conductor and Plaintiff.  Also, the crew should have been told to wait until the Rapid Responder arrived to attempt to remove the cotter key.

- BNSF's conclusions that Plaintiff violated safety policies was erroneous.

Generally, expert testimony is permitted under the following criteria:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other

5

>     specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reasonably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The court acts as a gatekeeper on two fronts under Rule 702 – whether the proposed expert witness is qualified to render the opinions he sets out and, if he is so qualified, whether the opinion is sufficiently supported by making "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993); *see also* Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1233 (10th Cir. 2005). This analysis applies to all expert testimony. Kuhmo Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

Just as the mere possession of a degree does not qualify and individual from rendering a specific opinion, the mere ownership of a small railroad leasing three miles of track does not qualify Mr. Rangel to render opinions concerning the removal of a cotter key from an F-style knuckle of which he admits he has had limited knowledge and experience. *See e.g.* Ralston v. Smith & Nephew

6

Richards, Inc., 275 F.3d 965, 970 (10th Cir. 2001)(". . . merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue")(citation omitted). At the outset, Mr. Rangel has no specialized training, skill, knowledge, or education to render an opinion on the safety of removing a cotter key on a broken F-style knuckle or the training or equipment necessary to safely do so. Indeed, he was not even aware such a cotter key existed on this type of knuckle for a good part of his career. This leaves his experience which can form an appropriate basis for forming an opinion or diagnosis. Kuhmo Tire, 526 U.S. at 152; Daubert, 509 U.S. at 592. However, the expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." United States v. Fredette, 315 F.3d 1235, 1240 (10th Cir. 2003) quoting Fed. R. Evid. 702, Advisory Committee Notes.

Nothing in Mr. Rangel's experience as an owner of a small railroad would establish his qualifications render his far-reaching opinions as an expert witness. He has little to no experience in the removal of a cotter key on a knuckle pin to remove the F-style knuckle at issue in this case. The record is devoid of evidence that Mr. Rangel taught this type of specialized training in his MODOC Academy but rather only that it should not be done without sufficient support offered for this conclusion.

7

As a result, this Court concludes that Mr. Rangel is not qualified to render opinions on the safety of removing the cotter key.

Beyond his qualifications, Mr. Rangel has offered opinions in relation to which the methodology in arriving at the opinions is flawed. The Supreme Court has made clear that "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" Kumho Tire Co., 526 U.S. at 149 (1999) quoting Daubert, 509 U.S. at 592. To assist in the assessment of reliability, the Supreme Court in *Daubert* listed four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. Daubert, 509 U.S. at 593-94. The list is not exclusive, and courts applying Daubert have broad discretion to consider a variety of other factors. Kumho Tire, 526 U.S. at 150.

Generally, the focus should be upon an expert's methodology rather than the conclusions it generates. Daubert, 509 U.S. at

8

595. An expert's conclusions, however, are not completely immune from scrutiny. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). In the end, the purpose of the Daubert inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

A review of the various opinions offered by Mr. Rangel in his expert report reveals little support for the conclusions reached. Mr. Rangel states that Plaintiff and the conductor should not have removed the cotter key, that they received insufficient training to remove the cotter key, and that some warning was required from the railroad about the lack of safety in removing the cotter key. Mr. Rangel offers nothing but a bald assertion that Plaintiff and the conductor should not have attempted to remove the cotter key with no foundation for the opinion. He also states they received insufficient training to remove the cotter key. Certainly, Mr. Rangel ignores Plaintiff's deposition testimony. She believed the removal to be "no big deal" and was familiar with the operation to do so. *See* Plaintiff's Depo., p. 44, ll. 22-24. Mr. Rangel's opinion on the training is largely based upon his belief that the key knocker device is the safest

9

way to remove the cotter key and appears to suggest that it is the only way to remove it – again, without sufficient foundation stated in his testimony or expert report for arriving at such an opinion. BNSF is correct in its interpretation of the decision in Ezell v. BNSF Railway Co., 949 F.3d 1274 (10th Cir. 2020).  It is the obligation of the railroad to provide a safe workplace (and consequently for a plaintiff to prove the railroad provided an unsafe workplace in a FELA action) and not the safest possible workplace.  Id. at 1282.  ("But to show railroad negligence, FELA requires plaintiffs to show an unsafe workplace — not a failure to provide the safest possible workplace.").  Mr. Rangel fails to provide support for his opinion that the use of a hammer and chisel to remove the cotter key constitutes a breach of the duty for BNSF to provide a safe workplace – an opinion to which he was late coming at the Daubert hearing conducted by this Court.

Mr. Rangel also opines that Plaintiff was "tricked" by BNSF employees to violate federal regulations.  This is the type of "opinion shading" that clouds this expert's methodology as a whole.  The record – and Mr. Rangel – offers no support for this conclusion.

The opinion that the "Mechanical Help Desk" should have known that Plaintiff and the conductor did not have a key knocker device presupposes that any alternative removal means was *per se* unsafe.  This opinion lacks support in methodology.

10

Mr. Rangel also contends in his report and at the hearing that BNSF failed to provide training on cotter key removal, citing to the e-mail survey results to support his opinion. The ad hoc e-mail survey to unidentified – and apparently unidentifiable – individuals represented to be BNSF employees is precisely the type of manufactured support that the Daubert standards were formulated to avoid. Not only is the methodology of the surveying conducted by Mr. Rangel suspect, but it is prejudicial to BNSF the results cannot be tested for reliability. His conclusions are not supported by competent evidence or by tested methodology and will not be permitted.

Mr. Rangel states that the crew should have been told to wait until the Rapid Responder arrived to remove the cotter key. This statement is derivative of the contention that Plaintiff and the conductor should never have attempted to remove the key and is equally unsupported.

Mr. Rangel's final contention in his report that BNSF's conclusions that Plaintiff violated safety policies were incorrect is not the type of issue upon which expert testimony assists the jury. The jury as fact finder is fully capable of evaluating the evidence and determining whether BNSF's conclusions were correct.

As a result, this Court concludes that Mr. Rangel lacks the qualifications and did not employ reliable methodology to reach the conclusions to which he testified at the hearing and on which

11

he offered his expert report.  His testimony will be excluded from trial.

IT IS THEREFORE ORDERED that Defendant's *Daubert* Motion Regarding David Anthony Rangel (Docket Entry #157) is hereby **GRANTED**

IT IS FURTHER ORDERED that Defendant's Fourteenth Motion in Limine Regarding David Rangel's Opinions on the Cotter Key and Its Removal (Docket Entry #155) is hereby **GRANTED**.

IT IS FURTHER ORDERED that Defendant's Fifteenth Motion in Limine [Regarding Whether] RFE Beals Intentionally or "Maliciously" "Tricked" Plaintiff into Violating Federal Law by "Hiding" Vital Information or That RFE Beals is Culpable for Plaintiff's Injuries (Docket Entry #156) is hereby **GRANTED**.

IT IS SO ORDERED this 27th day of August, 2020.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE